IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Termination of Parental Rights to | ) ) ) | No. 33662-0-III (consolidated with |
| S.R.W.C.B.-J., | ) | No. 33666-2-III, No. 33667-1-III, |
| S.D.B.-J., | ) | No. 33663-8-III, No. 33664-6-III, |
| S.S.R.B.-J., | ) | No. 33665-4-III) |
| A.B.-J., | ) | |
| G.B.-J., and | ) | UNPUBLISHED OPINION |
| B.B.-J. | ) | |

SIDDOWAY, J. — After a three-and-a-half-year dependency and a six-day trial, the trial court entered an order terminating the appellant mother's parental rights to six children. The mother appeals the order, arguing (1) the record did not support the court's finding that the Department of Social and Health Services (DSHS) provided her with all necessary services to correct her parental deficiencies, and (2) the State failed to prove, and the court failed to consider, factors pertaining to incarcerated parents provided by RCW 13.34.180(1)(f).

We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

The appellant is the mother of seven children, her parental rights to six of whom are at issue in this appeal.[1]

---

[1] The seventh, the child of her current husband, was born in early 2015.

No. 33662-0-III; No. 33666-2-III; No. 33667-1-III; No. 33663-8-III; No. 33664-6-III; No. 33665-4-III
*In re the Parental Rights to S.R.W.C.B.-J.*

On August 17, 2011, DSHS caseworkers filed dependency petitions in Kittitas County, asking the court to declare the six children dependent. At the time, the three oldest children—all girls—were ages nine-and-a-half, eight, and six. The three youngest—all boys—were ages three, almost two, and one.

The petitions alleged that initiation of the dependency followed a call from the children's father, who told a social worker in DSHS's Ellensburg office that the family had been living in Stevens County; he and the mother (his wife) learned that someone might have reported them to Child Protective Services (CPS); the mother left with the children, ostensibly to go to a friend's home in Stevens County to get them cleaned up; but she instead traveled to Kittitas, where the maternal grandparents lived. According to the petitions, the father told the social worker he believed the mother was drinking continuously and possibly using marijuana and methamphetamine. He said he was most concerned about their youngest child, who the mother was still breast feeding.

The dependency petitions alleged that between 2003 and 2011, DSHS received 10 referrals concerning the parents' possible neglect of their children. Included were reports that the father had beaten the mother in front of the children, leading in one case to the father's conviction of domestic violence assault, and that the children were dirty, underweight, and neglected. In 2009, the children had stayed with their maternal

2

No. 33662-0-III; No. 33666-2-III; No. 33667-1-III; No. 33663-8-III; No. 33664-6-III; No. 33665-4-III
*In re the Parental Rights to S.R.W.C.B.-J.*

grandparents under a six-month voluntary placement agreement while DSHS offered the parents mental health, substance abuse, domestic violence, and parenting services.

The day after receiving the father's report, a social worker visited the maternal grandparents' home and found that the children were dirty and disheveled. She learned that in February of that year, the father and mother had moved with the children to Onion Creek, a rural town near the Canadian border, where they lived in a cabin without electricity, refrigeration, or running water.

Agreed orders of dependency were entered on October 20, 2011. The children were again placed with their maternal grandparents. The mother was ordered by the court to undergo a drug/alcohol evaluation, submit to UAs,[2] aftercare and treatment as recommended; to participate in parenting, domestic violence/anger management and mental health assessments; and to engage in treatment as recommended. Therapy services were also provided to the children.

During therapy, the children disclosed trauma experienced while living with their parents. The oldest daughter, nine-and-a-half-year-old S.,[3] was the most explicit reporter, disclosing to her therapist, Mary Day, that while living in Onion Creek the children went without food, medical and dental care, heat, and running water, and that their parents left

---

[2] Urinalysis.

[3] S.D.B.-J., the party to case no. 33666-2-III.

them alone frequently. S. reported witnessing parental alcohol abuse and violence. She confessed that she had been made to feel responsible for the drowning death of the firstborn child in the family—her older brother. Her mother told her that when S. was four months old, S.'s crying had distracted the person who was supposed to be watching her 18-month-old brother. S. also revealed that years earlier, her mother had taken her to a party and left her alone in a room where four or five men sexually assaulted her. (The allegation was investigated but determined to be unfounded due to lack of evidence.) S. was diagnosed with post-traumatic stress disorder.

The second-oldest daughter, eight-year-old A.,[4] reported to her therapist that she had seen her mother have sexual relations with different men without the covers on, and that her mother would be absent for days and sometimes a week at a time and was "'always drunk.'" Report of Proceedings (RP) at 87. She described one Easter when her mother left for the store to buy eggs and had not returned for a week. As a result of these traumas, A. suffered from anxiety over the possibility that she might be placed back in the care of her mother.

Two of the other children were diagnosed with mental health disorders. The middle son was diagnosed with selective mutism, which his therapist attributed to anxiety. The oldest son was diagnosed with disruptive behavioral disorder, exhibited by

---

[4] A.B.-J., the party to case no. 33663-8-III.

No. 33662-0-III; No. 33666-2-III; No. 33667-1-III; No. 33663-8-III; No. 33664-6-III;
No. 33665-4-III
*In re the Parental Rights to S.R.W.C.B.-J.*

acting out violently and disregarding instructions, which his therapist attributed to a lack of rules and consistency.

In roughly the first year following the commencement of the dependencies—from August 2011 through September 2012—DSHS provided the mother with all services ordered by the court. She completed a psychological assessment with Dr. Robin LaDue[5] in the spring of 2012 and was diagnosed with depression, alcohol dependency, post-traumatic stress disorder and personality disorder. She then began participating in counseling with Dr. LaDue, who worked with the mother on issues of domestic violence and problems with her children; the mother credits Dr. LaDue with supporting her in filing for divorce from the children's abusive father in July 2012. A chemical dependency assessment conducted in October 2011 diagnosed the mother as chemically dependent on alcohol and marijuana and at "high risk" to relapse.[6] RP at 325. She completed chemical dependency treatment in August 2012. She began domestic violence services in 2011, which she continued in 2012.

By the time of a review hearing in September 2012, DSHS reported to the court that the mother had complied with the dependency order and completed all services. At

---

[5] The record contains different spellings of the doctor's surname, but "LaDue" appears to be correct.

[6] She had earlier completed chemical dependency treatment in 1992, 1993, and twice in 2009.

that time, the permanency plan was for the mother to live in a guest house on the maternal grandparents' property and co-parent her children with their maternal grandparents, who would be appointed either nonparental custodians or guardians of the children. No final relationship had been agreed.[7]

The next year—October 2012 through September 2013—did not bode well for a return of the children to their mother. On December 12, 2012, the mother self-reported an alcohol relapse to her social worker. In January 2013 she moved out of the guest house and into an apartment elsewhere in Ellensburg. The move angered the maternal grandparents, surprised DSHS personnel and the children's guardian ad litem, and upset the children. The move was regarded by DSHS personnel and the guardian ad litem as frustrating the understanding that by living adjacent to the maternal grandparents, the mother could co-parent and work on restoring the relationship with her children. In February 2013, the girls refused to attend further visitation with their mother.

In response to the deterioration in the relationship between the mother and the children, and the mother's complaint to the court that she was not having visitation with her daughters, new services were identified. In April 2013, the mother was referred to a

---

[7] Although the orders entered following the September 27, 2012 review hearing included a finding that "2/12/13 is the projected date for [x] return of the child to his or her home," Exs. 29-34 at 6, multiple witnesses testified at the termination trial that nonparental custody or guardianship with the maternal grandparents was the sole option for each child under consideration at that time.

new mental health counselor, Rose Roberson, since Dr. LaDue was unavailable. Ms. Roberson's expectation for the therapy was "to help [the mother] understand as a [domestic violence] victim the impact on her and certainly on her children" and "individual therapy to address her trauma and loss," consistent with services that had earlier been recommended by Dr. LaDue. RP at 288. S.'s therapist, Mary Day, agreed to attempt or reconvene joint therapy between S. and her mother.[8]

Between May and December, appointments for the mother with Ms. Roberson were scheduled, with the knowledge and agreement of the mother, for seven dates: May 13, June 3, July 8, August 13, November 11, December 5, and December 9. The mother rescheduled both the May and June appointments, seeing Ms. Roberson for the first time on July 8. She no-showed for the August and November appointments. She appeared for the December 5 appointment, but then no-showed on December 9. Ms. Roberson never heard from her again.

Ms. Day conducted a single joint therapy session with S. and her mother but it did not go well. Ms. Day refused to include the mother in her therapy sessions with S. thereafter.

In September 2013, the mother was in the process of moving into the Bremerton

---

[8] At the termination trial, the mother and Ms. Day disputed the extent of prior joint therapy with S.

7

home of a man, Mr. Dixon, who she had been dating since the prior December, when her ex-husband made contact and offered to help her with some of her legal expenses. During the month of August her ex-husband stayed briefly at Mr. Dixon's home with both the mother and Mr. Dixon. At one point in the brief stay, her ex-husband, after drinking heavily, committed a second degree assault of Mr. Dixon. Upon learning of the domestic violence incident, DSHS employees were concerned. They worried that in tolerating her ex-husband to stay in the Dixon home, the mother showed she had not internalized her domestic violence training. They were concerned about alcohol use in the Bremerton household.

On September 26, 2013, two years after the commencement of the dependency, the State petitioned the court to terminate both parents' parental rights. Notice of a March 25, 2014 trial was filed in early October 2013.

On September 5, 2013, a UA provided by the mother tested positive for alcohol. Since she was now living in Bremerton, DSHS provided her in October 2013 with a referral for an updated chemical dependency assessment in Kitsap County. The mother initially agreed to the assessment but later notified DSHS that she intended to pursue an assessment at another agency. Although DSHS requested the results of that evaluation, the mother never provided them. Between May and December 2013, the mother missed 19 UAs. DSHS considers "no-call or no-show UAs" to be positive. RP at 389.

8

In the third year after the filing of the dependency—from September 2013 through August 2014—and with the termination petition having been filed and trial date set, the mother's conduct continued to weigh against a return of her children.

On January 1, 2014, the mother was arrested in Kittitas County and charged with driving under the influence (DUI). Fifteen days later, on January 16, she was arrested again, this time in Pierce County, and was again charged with DUI. Shortly following the second arrest, she fought with Mr. Dixon at his Bremerton home, with the result that he was charged with fourth degree assault and a no-contact order was entered against him. The mother moved out of his home and into a series of temporary housing arrangements for months, making it difficult to DSHS employees to contact her.

The mother violated the terms of her pretrial release by failing to report for UAs twice, on January 24, 2014, and again on April 8, 2014. She violated the terms a third time when she appeared for a UA on April 23, 2014, and tested positive for methamphetamine. She violated requirements that she meet with the probation department on several occasions. All told, the Kittitas County probation department filed five violation reports on the mother between January 2 and her sentencing, resulting in the issuance of arrest warrants. Her last reported violation occurred on May 6, 2014, when she cut off an alcohol monitoring bracelet (transdermal sensor) that she had been court ordered to wear as a condition of her release.

No. 33662-0-III; No. 33666-2-III; No. 33667-1-III; No. 33663-8-III; No. 33664-6-III;
No. 33665-4-III
*In re the Parental Rights to S.R.W.C.B.-J.*

The mother's outstanding warrants led to her being arrested when she was having

supervised visitation with her sons in Ellensburg. Between January and July of 2014, she

missed 16 out of 27 scheduled visitations with her sons, in some cases because of the

outstanding warrants for her arrest.

On the March 25 date of the termination trial, the mother appeared but sought a

continuance and court appointment of a lawyer. The court ruled she had waived her right

to a court appointed lawyer and that trial would proceed. The mother then agreed to

relinquish custody of the children and signed a relinquishment and consent to

termination. She revoked it the next day (which she had the right to do during a 48-hour

waiting period before court approval), later testifying she only signed it to avoid going to

a trial for which she was unprepared.

The court proceeded with the trial a week later, on April 3, but after the mother

appeared on the second day of trial with a lawyer, the court relented and continued the

trial to July 3, 2014, to allow the mother's lawyer time to prepare.

A week before the continued trial date, the mother's lawyer requested a

continuance, explaining she had been unable to communicate with the mother for much

of May and June. The need for a continuance proved moot when it came to the attention

of the mother's lawyer and the judge that 14 years earlier, while serving as a public

10

defender, the judge had represented the mother in connection with her violation of probation imposed for an alcohol consumption-related crime. The judge recused himself.

A July 18, 2014 chemical assessment ordered by the Pierce County District Court as a condition of the mother's probation diagnosed her, again, with alcohol use disorder. She was required to undergo treatment, and intensive outpatient treatment at Cascade Recovery began in August 2014. In completing information for Cascade, the mother failed to disclose the pending parental termination proceeding. According to her counselor at Cascade, the mother was not honest about her history with DSHS until the counselor learned of it independently and confronted her in late November 2014.

The mother and Mr. Dixon married in October 2014. Although the mother's visitation with her sons improved after August or September of 2014, the visitation schedule had been reduced to once a month, for two hours. The mother completed her treatment at Cascade in February 2015.

The termination trial before a visiting judge began on May 6, 2015. Over six days, the testimony of 20 witnesses was presented. At the time of trial, the children had been in the care of their maternal grandparents for almost four years. The children's therapist assessed the grandparents' home as a "stable, predictable and reliable home environment" and testified that the children had shown "vast improvements and are no longer exhibiting symptoms consistent with their original diagnoses." RP at 88, 114.

11

At the conclusion of trial, the trial court announced from the bench that the State had proved a basis for termination of both parents' parental rights to the six children by clear and convincing evidence. In delivering oral findings with respect to the mother, the court commented in strong terms on the fact that the mother continued to minimize her alcohol abuse and the trauma that she and the children had been through, and expressed the view that her lack of honesty, whether intentional or delusional, "just shows that she has not come to grips with the problems that she has." RP at 839.

The mother appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful of reasons.'" *In re S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington's termination of parental rights statute responds to this constitutional command by providing a two-step process before a court may terminate parental rights.

12

No. 33662-0-III; No. 33666-2-III; No. 33667-1-III; No. 33663-8-III; No. 33664-6-III;
No. 33665-4-III
*In re the Parental Rights to S.R.W.C.B.-J.*

The first step requires that the State prove six statutory elements, the first three of which

are procedural and are seldom in dispute. Where a termination decision is appealed, it is

the State's proof of the remaining elements that are most often challenged—those being

its burden of proving

> [t]hat the services ordered [to be provided to the parent] have been
> expressly and understandably offered or provided and all necessary
> services, reasonably available, capable of correcting the parental
> deficiencies within the foreseeable future have been expressly and
> understandably offered or provided,

RCW 13.34.180(1)(d);

> [t]hat there is little likelihood that conditions will be remedied so that the
> child can be returned to the parent in the near future,

RCW 13.34.180(1)(e); and

> [t]hat continuation of the parent and child relationship clearly diminishes
> the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(f).

This first step "focuses on the adequacy of the parents and must be proved by

clear, cogent, and convincing evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232

P.3d 1104 (2010) (footnote omitted). "Clear, cogent and convincing evidence exists

when the evidence shows the ultimate fact at issue to be highly probable." *In re

Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Proof of the six

statutory elements by clear, cogent and convincing evidence satisfies the requirement of

13

due process that a parent be found currently unfit before terminating the parent-child relationship. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

The second step is for the court to ascertain the best interests of the child. RCW 13.34.190. "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

In this case, the mother contends that 15 of the trial court's findings of fact are not supported by substantial evidence and that its findings do not support 3 of its conclusions of law. She also contends that the juvenile court failed to weigh the impact of incarceration in considering whether the parent-child relationship diminished her children's prospects for early integration into a stable and permanent home, something she argues was required by RCW 13.34.180(1)(f).

Whether a termination order satisfies statutory requirements is a question of law that we review de novo. *K.N.J.*, 171 Wn.2d at 574. "The court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137 Wn.2d at 925. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue. *S.J.*, 162 Wn. App. at 881. "The trial judge has the advantage

14

of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." *K.S.C.*, 137 Wn.2d at 925.

We address the mother's challenges in turn.

### I. Sufficiency of the evidence to demonstrate the State's offer or provision of necessary services

Although the mother assigns error to 15 of the court's findings of fact,[9] she only meaningfully addresses findings 2.9 and 2.27, in which the court found DSHS had offered or provided her with all necessary services, and elaborated on its efforts. Specifically, she argues that joint therapy with her children was critical to her family's reunification and not only was it not offered, it was affirmatively denied. With respect to the other challenged findings, she merely argues, conclusorily, that the court's findings of her harmful conduct, parental deficiencies, and negative impact on her children fail to consider her "thwarted" efforts to be a part of her children's therapy and the court thereby "err[s] to the extent it blame[s]" her. Br. of Appellant at 13-16.

We note first, that there was a stark contrast between the testimony of the mother and the State's witnesses as to the extent of DSHS's employees' and providers' communications with, or efforts to communicate with, the mother. The trial court's several findings that available services were communicated to the mother make clear that

---

[9] Findings 2.9, 2.11, 2.14, 2.15, 2.16, 2.17, 2.18, 2.20, 2.21, 2.22, 2.23, 2.24, 2.25, 2.26, and 2.27. Br. of Appellant at 1-3.

it believed the State's witnesses on this score. Even when a standard of clear, cogent and convincing evidence applies, "'[w]e still view the evidence and all reasonable inferences in the light most favorable to the prevailing party.'" *In re M.J.*, 187 Wn. App. 399, 407, 348 P.3d 1265 (2015) (quoting *In re Trust & Estate of Melter*, 167 Wn. App. 285, 301, 273 P.3d 991 (2012)).

In challenging the State's failure to provide joint parent-child therapy, the mother likens her situation to that of the mother in *In re Welfare of C.S.*, 168 Wn.2d 51, 225 P.3d 953 (2010). In *C.S.*, the mother's only identified parental deficiency was substance abuse. *Id.* at 53-54. The mother corrected that deficiency and was sober for a year before a termination petition was filed. *Id.* She had been sober for 22 months by the time of the termination trial. *Id.* at 56 n.2. Nevertheless, because C.S. had been diagnosed with four behavioral disorders that made him difficult to manage, the trial court found the mother lacked the necessary "'patience, presence of mind, skills, experience, time in a day, and availability'" to adequately care for him, and on that basis terminated her parental rights. *Id.* at 55.

C.S.'s foster parent, who had also experienced difficulty in managing him, had been provided with training on how to better manage C.S.'s behavior. The Supreme Court reversed the termination order, holding that by failing to offer the same training to the mother, DSHS failed to provide her with all necessary services. *Id.* at 56. It

16

explicitly noted that the trial court had concluded the mother "had no lingering deficiency from substance abuse or mental health issues that would preclude her from *caring* for C.S., much less successfully completing training to do so." *Id.* at 56 n.4.

The mother in this case fastens on the fact that in January 2013, the maternal grandparents, as the then-current caregivers, were included in the therapy being provided to her two oldest sons, yet inclusion in the boys' therapy was not offered to her, even though some of DSHS's witnesses testified she would benefit from therapy with her children at some point. She ignores the testimony of multiple State witnesses that joint therapy between her and her children was considered and ruled out as unhelpful until she addressed her alcohol abuse and obtained additional therapy of her own.[10]

Therapist Mary Day testified at trial that during the one joint therapy session that was attempted between S. and her mother in 2013, "[S.] basically told her mother that her heart was broken, that she was in pain, [and] that she was angry." RP at 123. Rather than validate or support S., the mother responded that she was in pain and angry too,

---

[10] We are not persuaded by the mother's argument that there was a brief window in late 2012 when she was in compliance with court-ordered services and apparent remission from her alcohol abuse, in which joint therapy could have commenced successfully. It was, in part, the attempt at joint therapy in 2013 that caused the clinical team to conclude the mother needed additional counseling before joint parent-child therapy could succeed. The clear implication of the evidence is that if joint therapy had been tried earlier, the mother's lack of readiness for it would simply have been recognized earlier.

17

because her parents betrayed *her*. Because Ms. Day viewed the mother's response as entirely unhelpful to therapy for S., she did not allow the mother to participate in S.'s therapy thereafter.

Later, in August 2014, the mother met with Ms. Day to discuss "what [S.] would need from her," and Ms. Day told the mother that S. needed validation and support for the trauma experienced while living with her parents. According to Ms. Day,

> [the mother's] response was that the trauma and abuse did not occur. The neglect did not occur and that she believed that [S.] had been coached by myself and CPS to make those allegations.

RP at 123. Ms. Day testified the mother left the session after about five minutes.

Joint therapy was not a service that was capable of correcting the mother's parental deficiencies within the foreseeable future, and it is those services that are required to be offered or provided under RCW 13.34.180(1)(d). Termination of parental rights remains appropriate if an overlooked service would not have remedied the parent's deficiencies in the foreseeable future. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008) (citing *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001)). Jessica Strawn, the DSHS social worker assigned to the family's case in and after December 2013, testified that even once the mother's other deficiencies had been resolved, it would take two years to provide the mother with the skills necessary to address her children's trauma. Two more years is not the foreseeable future.

18

In fact, the record includes no evidence that joint therapy would have addressed the mother's substance abuse or domestic violence issues at all. *See T.R.*, 108 Wn. App. at 162-63 (finding that family therapy to reunite the children would not have remedied mother's parental deficiencies of low level functioning, disorganization, lack of insight, and inability to care for one child). Dr. JoAnne Solchany, the mother's expert witness, diagnosed the mother with chronic post-traumatic stress disorder and characterized her as in the early stages of remission for alcohol abuse, and, when asked by the trial court, agreed the mother needed to work on herself, resolve those issues, and be in a stable place emotionally before she could successfully parent her children. Dr. Solchany never testified that joint therapy with the children would solve the mother's problems.

This case is therefore materially unlike *C.S.* C.S.'s mother resolved her only parental deficiency identified by the dependency petition 22 months before the termination trial. The only later-identified deficiency relied on in terminating her rights was the fact that she lacked education on parenting a special needs child. And in her case, there was no apparent obstacle to her receiving that education.

This mother, by contrast, was found by the trial court to have several continuing deficiencies, the key ones being longstanding chemical dependency with a history of relapse, that was at best in early remission at the time of trial; and two relationships in which there were documented allegations of domestic violence and no-contact orders, the

19

significance of which (for herself and her children) she had failed to grasp and continued to minimize. There was no evidence that joint therapy would address those deficiencies. And there were major impediments to joint therapy: the objections of her children's therapists, and her daughters' objections to having any contact with her at all.

Even if it could be argued that joint therapy was a necessary service, it is well settled that the statutory requirement to offer or provide corrective services does not contemplate an entirely one-way process, and "a parent's unwillingness or inability to make use of the services provided excuses the state from offering extra services that might have been helpful." *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) (citing *In re Welfare of Ferguson*, 41 Wn. App. 1, 6, 701 P.2d 513 (1985)). The mother was given the opportunity to continue counseling with Ms. Roberson and chose to walk away from it.

Findings 2.9 and 2.27 are supported by substantial evidence. DSHS did not thwart the mother's ability to avoid the harmful conduct, parental deficiencies, and negative impact on her children addressed by the remaining findings that she challenges only conclusorily. Because the error she assigned to three of the court's conclusions of law is predicated solely on her challenges to the factual findings, no separate analysis of the basis for those conclusions is required.

20

## II. Consideration of incarceration factors

The mother served 20-days' incarceration for her second DUI in June and July 2014, may have served one day for her first DUI, and served additional time in jail for her pretrial release violations. She argues that because she was incarcerated for between 32 and 45 days during the three-and-a-half-year dependency, the trial court was required to consider additional factors under RCW 13.34.180(1)(f) before terminating her parental rights.

Under RCW 13.34.180(1)(f), when filing a petition to terminate parental rights,

> [i]*f the parent is incarcerated*, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

(Emphasis added.)

Division One of this court recently held that RCW 13.34.180(1)(f) only applies to parents who are incarcerated at the time of the termination hearing. *In re Dependency of D.L.B.*, 188 Wn. App. 905, 916, 355 P.3d 345 (2015), *review granted*, 184 Wn.2d 1034, 366 P.3d 932 (2016). The court reasoned that the plain statutory language "*is incarcerated*" indicates the statute applies only to those parents who are incarcerated at the time of the termination trial, not those who were incarcerated at some point during the

21

dependency, and that when the legislature intends to include prior incarceration, it uses the terms "current or prior incarceration." *Id.* at 917-18 (emphasis omitted). The language the mother relies on was among several related amendments enacted in the same 2013 session law, which Division One concluded reflect the "legislature's intent to give incarcerated parents the opportunity to participate and have their rights considered during discrete stages of the dependency and termination process, such as during the case conference, when developing a permanency plan and at the permanency planning hearing, and at the termination hearing." *Id.* at 918.

This reasoning is persuasive. And whatever meaning our Supreme Court may hereafter accord to the 2013 amendment of RCW 13.34.180(1)(f), we cannot imagine that it would require special consideration of incarceration impacts for a parent who was not only not incarcerated at the time of trial, but who had also been free of confinement for approximately 97 percent (or more) of the duration of the dependency.

Since the court was not required to consider the incarceration factors in applying RCW 13.34.180(1)(f), we need not examine what its consideration of the factors should have yielded.

Affirmed.

22

No. 33662-0-III; No. 33666-2-III; No. 33667-1-III; No. 33663-8-III; No. 33664-6-III;
No. 33665-4-III
*In re the Parental Rights to S.R.W.C.B.-J.*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Siddoway, J.

WE CONCUR:

Fearing, C.J.

Pennell, J.

23