IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Termination of: | ) | |
| | ) | No. 32321-8-III |
| M.J. and M.J. | ) | (consolidated with |
| | ) | No. 32322-6-III) |
| | ) | |
| | ) | OPINION PUBLISHED |
| | ) | IN PART |

KORSMO, J. — A prisoner challenges the termination of her parental relationship

with her two youngest children, arguing that the trial court did not properly consider the

latest amendments to Washington's statutory policy regarding incarcerated parents.

Because of conflicting evidence, the trial court's failure to explain its reasoning leaves us

uncertain how the court applied the statute. We remand for the trial court to conduct its

balancing on the record.

## FACTS

Appellant A.E. is the mother of four children, the two youngest of whom are at

issue in this action. A.J. is the father of the two younger children, Mal and Mak, born in

2009 and 2010, respectively.[1] A.E.'s two older children reside with their father.

---

[1] Because the children share initials and have similarly spelled names, we use
diminutive forms of their first names to preserve privacy.

By September 2011, A.J. had taken on a teenage girlfriend. A.E. then was nearly 30 years old, while Mal was 25 months of age and Mak nearly 14 months. About a month earlier, A.E. had kicked A.J. out of the family home for acts of domestic violence against her and the children. Nonetheless, A.J. arranged for A.E. and his new girlfriend to fight for his affections in a public parking lot. A.E. brought a kitchen knife to the encounter. As their fight unfolded, A.E. pulled out the knife and struck a single blow that severed an artery, killing her 18-year-old opponent. The police arrested A.E. and the two younger children were taken into protective custody.

A.E. pleaded guilty to one count of second degree murder in accordance with a plea agreement. The court imposed a bottom end sentence of 123 months in prison. A.E.'s earliest release date will be in December 2020. During the 10 months she spent in the Walla Walla County Jail before her transfer to the women's prison at Purdy, A.E. had one visit with both children and a second visit with Mak.

A dependency petition was filed shortly after A.E.'s arrest. The children were found dependent. Initially, the Department of Social and Health Services (DSHS) expected to return the children to their mother. However, DSHS was not able to find family members willing to serve as guardians for the long-term. In view of the significant needs of the children and the mother's lengthy prison sentence, the department filed a petition to terminate the parent-child relationships of both A.J. and A.E. A.J. defaulted and his parental rights were terminated.

After the arrest, the children went through a series of residences. E.E., mother of A.E. and grandmother of the children, initially was watching them during the fight and eventually sent them to her son in the tri-cities. This uncle was unable to care for the children long-term. The children were then moved to their first foster placement. Both the uncle and the foster placement reported struggles with Mal's behavior including temper tantrums, throwing things, fits of screaming, biting, pinching and sleeping problems. Meanwhile, baby Mak was showing a lack of engagement and developmental delays including cognitive and communication delays, motor skill delay and Coombs disease. The children were then placed with E.E. until another placement could be arranged. E.E. was not considered for a long-term placement because she indicated that she could not take the children beyond respite care due to her poor health and struggles with Mal's behavior.

From their grandmother's house, the children went into another foster home where they continued to exhibit extreme behaviors and developmental delays. A few months later, they were moved to the home of another maternal aunt and uncle, N.D. and P.D., but the combination of N.D.'s health and the children's behavioral needs made the placement unsuitable. After another short respite with E.E., the children returned to their previous foster home. Their behavior stabilized somewhat but in April 2013, they were moved to yet another foster home. That family agreed to continue caring for Mak, but

3

requested that Mal be moved to another home. Mak remained with that foster family. She has bonded to them and they wish to adopt her.

E.E. provided respite care for Mal while DSHS sought a new placement. E.E. then told the Department that she was available as a long-term placement for both children though she indicated that she could not be a permanent placement. DSHS instead moved Mal to his current placement, a foster home in Spokane. One of the parents in that home has professional experience with similar behavioral issues and the family was willing to continue efforts to seek out services and follow the therapy plan. They have expressed interest in adopting Mal.

Mal was evaluated by a developmental and behavioral specialist who assessed the child to be hyper vigilant and over-tuned to sounds in his environment. The specialist reported that Mal does not have a secure attachment with anyone. However, without any assessment prior to shelter care, he was unable to identify whether the behavior issues were a result of his birth home or the frequent changes in foster care. Mak was overweight and not able to crawl when she entered foster care. She was enrolled in the Early Learning Program where she was able to meet some milestones.

In light of Mal's attachment issues and Mak's developmental delays, DSHS concluded that it was in the best interests of the children to find a permanent placement as soon as possible. Based on these assessments, DSHS believed that maintaining a relationship between the mother and children would negatively impact their development

4

and growth. Additionally, visits to Purdy were deemed infeasible because of the age of the children, the length of the drive, and the need for overnight accommodations. The specialist believed that any more than two visits annually would be bad for the children.

The termination case proceeded to trial in January, 2014. DSHS explained why it did not consider E.E. for a permanent guardianship. A social worker, Mr. King, testified that he had concerns about smoking in the house if the children went with their grandmother. He noted safety concerns because of the presence of chemicals, "a lot of stuff kind of stacked funny," and cigarette buds by the backdoor. Mr. King believed E.E. was frustrated with the children's behaviors and the children were beyond her capabilities for care. During one of the respites, she made negative comments about the children in front of them. Additionally, DSHS was concerned that she did not engage with the children by playing with them and lacked faith that she would get them to their appointments. It did not conduct a home study with E.E. The most recent social worker assigned to this case, Ms. Millar, testified that E.E. would not pass an adoptive home study.

While in custody, A.E. made constant requests to visit with her children. She diligently communicated with them by sending letters and pictures, and she made sure they had gifts for Christmas. A social worker said, "I know that Ms. [A.E.] loves her kids. I don't think there was ever a doubt. She was more vigilant as far as

5

providing letters for her kids than about any parent I have ever seen." Report of Proceedings (RP) at 80.

Despite the mother's efforts, DSHS's position was that the amount of time to wait was too long to resolve the children's attachment, instability and chaos issues. While A.E. might be attached to the children, they were not attached to her. A.E.'s counsel argued that it was in the best interests of the children, as recognized by the legislation addressing an incarcerated parent's role in maintaining a relationship with her children, for A.E. to have a meaningful role in their lives and she was making strong efforts at having a meaningful role. Counsel contended that the sole issue in the termination decision was the mother's incarceration.

The trial court analyzed the case in terms of the attachment issue and what could be done about it:

> The problem is it is six years. But six years isn't really correct either because mom would have to be out in the community, stabilized so the Department can view where she is at that point in time, which is sort of an unknown then. I mean, that could be months or years as well.

RP at 207. The court also noted the conundrum facing reunification efforts. It would take visitation several times a month for the children to develop a relationship with their mother, but visiting more than twice a year was disruptive to them.

6

The court concluded that termination of the parent relationship was appropriate in order to find a permanent placement for each child. Written findings were entered in support of each order. A.E. then promptly appealed.

This court accelerated review in front of a panel of judges. A group of amici curiae were permitted to file a brief in support of A.E. and participated in oral argument.

ANALYSIS

A.E. presents five arguments, two of which we address in the published portion of this opinion. Amici addresses many of the same issues and we consider their brief to the extent it addresses issues presented by A.E.[2] The primary question before us is whether the trial court failed to properly apply the 2013 amendments to RCW 13.34.145 and RCW 13.34.180(1)(f) concerning incarcerated parents.[3]

The termination of parental rights statute provides a two-step process. The first step focuses on the adequacy of the parents and is subject to proof by clear, cogent, and convincing evidence. The second step focuses on the child's best interests, which need only be proven by a preponderance of the evidence. Only if the first step is satisfied may the court reach the second. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104

---

[2] Appellate courts will not address issues argued only by an amicus. *E.g., State v. Laviollette*, 118 Wn.2d 670, 680, 826 P.2d 684 (1992).

[3] LAWS OF 2013, c. 173, §§ 3, 4.

(2010). When assessing the adequacy of the parents, RCW 13.34.180(1) lists six elements, only one of which is at issue in this appeal, that the State must prove.

This court reviews factual findings for substantial evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). The findings required to terminate a parent-child relationship must be established by "clear, cogent, and convincing evidence." RCW 13.34.190(1)(a)(i); *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Where a party is required to establish its case by "clear, cogent, and convincing evidence," this court incorporates that standard of proof into its review. *In re Trust & Estate of Melter*, 167 Wn. App. 285, 301, 273 P.3d 991 (2012). Thus:

> When such a finding is appealed, the question to be resolved is not merely whether there is substantial evidence to support it but whether there is substantial evidence in light of the "highly probable" test. *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973); [*In re Reilly's Estate*], 78 Wn.2d [623,] 640[, 479 P.2d 1 (1970)] (recognizing that "[e]vidence which is 'substantial' to support a preponderance may not be sufficient to support the clear, cogent, and convincing" standard). We still view the evidence and all reasonable inferences in the light most favorable to the prevailing party, *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) and, as in all matters, defer to the trier of fact on issues of credibility. *In re Welfare of L.N.B.–L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010).

*Id.*

### 2013 Amendments

The 2013 amendments changed several features of our dependency statutes to address the problem of incarcerated parents and set forth a policy of attempting to help

8

the incarcerated maintain relationships with their children.[4] A.E. first takes issue with the

trial court's consideration of recently amended RCW 13.34.180(1)(f). It requires the

State to allege:

> That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

Everything after the first sentence was added by Laws of 2013, c. 173, § 4.

In turn, the amended RCW 13.34.145(5)(b) defines a parent's "meaningful role" in

terms of six factors:

> (b) The court's assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of the following:
>
> (i)    The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

---

[4] As originally proposed, H.B. 1284 (2013 legislative session) would have imposed a good faith duty on DSHS to help the parent develop a relationship with her child and also have prohibited DSHS from seeking to terminate the parent-child relationship solely due to the parent's incarceration. *See* H.B. 1284, at 4, 20, 63d Leg., Reg. Sess. (Wash. 2013).

(ii)    The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

(iii)   A positive response by the parent to the reasonable efforts of the department or the supervising agency;

(iv)    Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v)     Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi)    Whether the continued involvement of the parent in the child's life is in the child's best interest.

The effect of the two noted amendments was to require trial courts to consider whether an incarcerated parent could maintain a meaningful role, as defined, in the child's life and to require DSHS to make reasonable efforts to help the incarcerated person remedy parental deficiencies. Other amendments will be noted later in this opinion.

A.E. and the amici argue that the trial court either did not apply the 2013 amendments or misapplied them, and that the court needed to expressly enter findings on this factor in order to satisfy the statute. We disagree with the last argument and, unable

to ascertain how the trial court considered the 2013 amendments, reverse and remand for record consideration of that factor.

As to the necessity of findings in every case, the short answer to the argument is that the legislature did not require findings. It simply mandated *consideration* of the parent's ability to maintain a meaningful role despite her custodial status. RCW 13.34.180(1)(f). In contrast, the legislature has had no trouble mandating findings in other portions of the dependency statute when it has wanted to do so. For example, RCW 13.34.110 mandates a fact-finding hearing on a dependency petition and directs that the court "shall make written findings of fact, stating the reasons therefor." No similar directive is found in RCW 13.34.180(1). Instead, the court is directed to specify only whether it found certain allegations were established according to specific burdens of proof. RCW 13.34.190(1). The legislature has not mandated that the court's resolution of the allegations of § 180(1) be reduced to writing.

Nonetheless, it may well be the better course of valor for trial judges to opine, on the record, their "consideration" of the § 180(1) factors. A "consideration" of evidence ultimately means a weighing or balancing of facts, along with a resolution of that weighing. In many instances, particularly where the evidence is uncontested or the State's case is very strong, the court's conclusion will need no further explication.

This case, however, is not in that category. Here, the State's own evidence suggested that A.E. was a concerned mother trying hard to maintain a position in her

11

children's lives. One social worker described her as making greater efforts at communicating with her children than any other mother she had seen; there was no doubt A.E. loved her children. On its face, this evidence appeared to constitute a "meaningful role" under RCW 13.34.145(5)(b)(i). It was then for the trial judge to decide how A.E.'s efforts at maintaining a meaningful role in the children's lives despite her incarceration affected the children's "prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). This record, however, does not tell us whether or not the court did consider these efforts. It may have found them unavailing, or it may not have considered them at all. Without some indication that this information was considered by the trial court, we simply are not in a position to uphold the determination.[5]

Division One of the Court of Appeals recently reached a similar result in the first case under these amendments, *In re Dependency of A.M.M.*, 182 Wn. App. 776, 788-89, 332 P.3d 500 (2014). There the 2013 amendments took effect after the evidence had been taken at trial, but before the court rendered its decision. *Id.* at 789. The trial court did not indicate that its determination was informed by the new law; rather, the record demonstrated that the State did not present evidence on the issue and the parties and court

---

[5] Both A.E. (reply brief at pp. 1-4) and the amici (brief of amici curiae at pp. 9-11) argue that the trial court erred in failing to credit A.E.'s efforts. We disagree. Although her efforts at communicating with the children were undisputed by the State, the fact of contact only establishes that she was maintaining a meaningful role in the children's lives. It then becomes a consideration the trial court must undertake in its resolution of the .180(1)(f) factor. It is not a dispositive fact.

12

had not considered it. *Id.* at 787-88. The matter was reversed and remanded for further proceedings consistent with the opinion. *Id.* at 790.

Here, the State did present evidence on both sides of this factor and counsel for A.E. argued the new statute as the basis for denying the petition. While the new amendments were before the court in evidence and argument, the trial court's brief remarks at the end of the second day of trial primarily focused on the attachment issue. Accordingly, we do not know how, if at all, the court applied the "meaningful role" information in its assessment. Accordingly, we, too, remand for further proceedings. The trial court is free to conduct its assessment on the basis of the information already before it or, in its discretion, accept new information concerning the children, A.E., or any other factor that may have changed since the trial last year. The court's assessment may lead to a new outcome or an affirmance of its original decision. The court should make some record of its consideration of the mother's "meaningful role" and its ultimate ruling affirming or dismissing the termination proceeding should be reduced to writing. An aggrieved party may appeal to this court.

*Reasonable Efforts*

A.E. also argues that DSHS did not make reasonable efforts to keep her family together, focusing on the limited visitation at the county jail and the lack of visits to the state prison. DSHS explained why the visits were limited and showed how it was not in the best interests of the children to do more. The trial court agreed. There was no error.

13

As with the *A.M.M.* case, the 2013 amendments took effect during the pendency of the termination petition—after the petition had been filed and the services provided, but before trial and decision. Unlike the *A.M.M.* case, here DSHS presented evidence and argument concerning the 2013 amendments and their application to this case. The trial court's findings, likewise, addressed many of the facts relating to those amendments.

As previously noted, RCW 13.34.180(1)(f) provides in relevant part that the court "shall consider" whether DSHS "made reasonable efforts as defined in this chapter." RCW 13.34.180(5), discussed more fully in the succeeding section of this opinion, directs DSHS to "consider a permanent placement that allows the parent to maintain a relationship with" her children, including the possibility of a guardianship. RCW 13.34.136(2)(b)(i)(A) requires permanency plans to provide visitation opportunities "unless visitation is not in the best interests of the child."

From these provisions, A.E. and amici argue that DSHS had a duty to provide visitation. This argument overstates the effect of the new legislation. Once again, as it directed the court in RCW 13.34.180(1)(f), the legislature only directed DSHS in RCW 13.34.180(5) to "consider" a placement that would preserve the parental relationship. Even when it otherwise has required visitation, as in RCW 13.34.136(2)(b)(i)(A), the legislature has subjected the requirement to a proviso that the visitation must not be counter to the best interests of the children.

Accordingly, the legislation does not impose on DSHS a duty to provide visitation. Rather, the legislation does impose on DSHS an obligation to consider what it can do to preserve the family unit. RCW 13.34.180(1)(f), (5). To that end, visitation will need to be part of a permanency plan unless it is not in the best interests of the child. RCW 13.34.136(2)(b)(i)(A).[6] Thus, while visitation will frequently be a part of the services DSHS must provide an incarcerated parent, it is not an absolute obligation in all cases.

Here, however, DSHS acted under its guiding principles at the time of the dependency and limited the children's exposure to the jail setting. When the new statutory policy took effect after the termination petition was filed, DSHS did consider whether visitation was appropriate. The expert who examined these special needs children concluded that anything more than two annual visits was detrimental to the children. There also was testimony that due to the low or nonexistent attachment with A.E., extensive visitation would be necessary to have even a hope of creating or improving the parent-child attachment; two visits annually would not be sufficient. Thus, the trial judge understandably concluded that visitation was not in the best interests of the children, no matter how ardently their mother desired it.

---

[6] Although not at issue in this case, where the parent has committed one of several enumerated serious offenses against the child or a sibling, those crimes substitute for the findings required by RCW 13.34.180(1)(b)-(f) as factors to be established in a termination proceeding. *See* RCW 13.34.180(4). In a proceeding brought under that substituted process, visitation would not be in order. This provision also undercuts the argument that a duty to provide visitation exists in all cases.

DSHS changed its approach during the course of the proceedings below and considered its obligations under the new policy created by the 2013 amendments to chapter 13.34 RCW. A.E. and amici argue that in light of the recognized benefits of maintaining the parent-child relationship that the legislature enacted into law in 2013, DSHS should have done more. This argument, however, fails to recognize that when it adopted the general policy, the legislature expressly exempted the special cases from that policy. Where it is not in the best interests of the child, visitation should not be forced upon the child. In this case, the special needs of the children required that visitation be limited below the level needed to maintain the parent-child relationship. The 2013 amendments did not create a one-size-fits-all policy concerning visitation.

For both reasons—DSHS lived up to its statutory duty to consider visitation and the record established the statutory exception that visitation was not in the children's best interests—the trial court did not err in its evaluation of A.E.'s visitation argument.

Remanded.

A majority of the panel having determined that only the forgoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

A.E. presents three additional arguments that we address—one quite briefly—in this section of our opinion. She argues that DSHS did not pursue placement with E.E. and did not establish she was currently unfit. She also argues that it was not in the best

interests of the children to terminate the parental relationship. We address those challenges in the noted order.

*Placement with E.E.*

A.E. next argues that DSHS did not live up to its statutory obligations when it failed to conduct a home study and consider E.E. as a guardian during A.E.'s incarceration. Once again, A.E. reads more into the statute than she should.

The provision primarily at issue here is RCW 13.34.180(5). This provision was added by the 2013 amendments. It states:

> When a parent has been sentenced to a long-term incarceration and has maintained a meaningful role in the child's life considering the factors provided in RCW 13.34.145(5)(b), and it is in the best interest of the child, the department should consider a permanent placement that allows the parent to maintain a relationship with his or her child, such as, but not limited to, a guardianship pursuant to chapter 13.36 RCW.

RCW 13.34.180(5).

As we noted previously, this statute requires DSHS to consider a long-term placement that maintains the family unit. To its credit, DSHS was following that policy in this case prior to the enactment of the 2013 amendments. It was only after the family options were found not viable that it explored the possibility of adoption. DSHS explained at trial which families it considered as well as the reasons for not further pursuing family placements. The trial court accepted that testimony and entered identical

findings in each case that identified the efforts made and explained why the placements were not pursued.

With respect to the grandmother, E.E., each finding states in part:

> The maternal grandmother has also, at various times, expressed that she cannot provide a home for [Mak]; up until shortly before the termination trial, she demanded the social worker stop contacting her about possible placement. The grandmother is not appropriate as she has not consistently expressed an understanding of [Mak's] special needs nor a willingness to comply with department recommendations for her care. Her home is not suitable for a small child. The department cannot recommend the child be moved again and the court finds that moving the child again is not in the child's best interest and will be detrimental to her mental health and development.

Clerk's Papers at 92.

A.E. argues that her mother changed her mind about caring for the children. Even if that is the case, it does not detract from the fact that DSHS considered her for permanent placement, just as it considered other family members who stepped up to help out during the incarceration. DSHS also explained why, in its opinion, E.E. was not an appropriate placement. It fulfilled its duties under the statute. Having considered the option, we do not believe DSHS had a continuing obligation to reopen the matter simply because E.E. was now expressing an interest. There also were other reasons beyond her initial unwillingness to serve that led to the decision not to pursue the guardianship.

18

There were other options for the family. A.E. could have filed a guardianship petition naming E.E. as guardian if she desired that option. *See* RCW 13.36.030(1), (2). A.E. did not. Similarly, E.E. was able to file a third party nonparental custody petition if she so desired. RCW 26.10.030(1). She did not.[7] Accordingly, we need not decide if DSHS had any obligation to reconsider its decision upon the filing of an appropriate petition.

The record reflects that DSHS considered E.E. for potential permanent guardianship. It also explained why they did not pursue that option—E.E.'s lack of desire and unfitness for the position. No more was needed.

The trial court correctly concluded that DSHS met its obligations under RCW 13.34.180(5). There was no error.

*Current Unfitness*

The next issue presented is the one that we address summarily. A.E. correctly points out that the trial court did not make an explicit finding that she currently was unfit to parent the children. *A.B.*, 168 Wn.2d at 920. Where an express finding is missing, a

---

[7] At the beginning of trial, A.E.'s counsel advised the court that E.E. had prepared such a petition and would file it then if the court desired. The trial court, after hearing opposing argument from counsel for DSHS, decided that the termination trial would proceed. Our record does not reflect if the petition was ever filed.

19

reviewing court may infer the finding if the trial court intended to make such a finding. *Id.* at 921.

Because we are remanding the case for explicit consideration of the mother's meaningful role in the children's lives and its effect on the court's analysis of the RCW 13.34.180(1)(f) factor, we need not decide what the trial court intended in this instance. The trial court must necessarily make a new fitness/unfitness ruling once it has completed its reconsideration of the (1)(f) factor.[8]

*Best Interests of the Children*

The final issue presented by this appeal is a contention that the evidence did not support the trial court's conclusion that termination of the parent-child relationship was in the best interests of the children. The evidence amply supported that determination.

Once the trial court finds that the six factors of RCW 13.34.180(1)(a)-(f) have been established by clear, cogent, and convincing evidence, the court must then determine whether termination of the relationship is in the best interests of the child. RCW 13.34.190(1)(b). This determination is subject to proof by a preponderance of the evidence. *A.B.*, 168 Wn.2d at 911-12.

---

[8] Citing to her own view of her "meaningful role" in the children's lives, A.E. also argues the evidence is insufficient to support an unfitness finding. Since the trial court has not necessarily undertaken an analysis of this aspect of the case, we leave review of this issue for later, should it be necessary after the trial court conducts its reweighing.

The evidence established that one child did not know A.E. and the other barely knew who she was. While she was making strong efforts to play a meaningful role, she was not parenting the children. She did not direct their care or their caregivers. Both children had special needs that she was unable to supply. She was going to be out of their young lives for a lengthy period of their development.

By the time of trial, both children had found stable foster homes actively addressing their special needs. Each home was willing to adopt the child. Each child had a permanent home in the offing instead of the uncertainty of a long term of foster care while awaiting a mother who might one day be able to return to their lives. The trial court, understandably, concluded that the evidence favored termination of the relationship.

This is a sad case. A.E. was making efforts to remain a mother to her children, but she dug herself a deep hole that she could not get out of, if at all, for a long time. The fact that most children, in general, benefit from maintaining a parent-child relationship does not mean that every child will benefit. The general rule probably works most often in a situation where the parent has a strong relationship with the child that can survive a period of time with limited contact. For very young children with little to no relationship with a parent, the general rule will often not play out favorably. For children with special needs that a parent can not satisfy, there is even less likelihood of a successful outcome. In this case, the evidence showed that the children would benefit from a new home rather

21

than spend their entire youth in uncertainty. The trial court's decision is supported by the evidence.

Remanded for further proceedings consistent with this opinion.

_____
Korsmo, J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

22