# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Interest of E.J.W., | No.  47545-6-II |
| A minor child. | |
| J.W. and S.W., | |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON; DEPARTMENT OF SOCIAL AND HEALTH SERVICES CHILDREN'S ADMINISTRATION, | UNPUBLISHED OPINION |
| Respondents. | |

Worswick, J. — J.W. and S.W. appeal the juvenile court's termination of their parental rights to their son, E.W.  Both argue that the juvenile court (1) violated their Fifth Amendment rights against self-incrimination by basing its termination order on J.W.'s and S.W.'s refusal to admit they abused their children, (2) abused its discretion by denying J.W.'s and S.W.'s motions for a protective order, and (3) erred by finding that the Department established the elements of RCW 13.34.180(1)(f) by clear, cogent, and convincing evidence.  We disagree and affirm the termination order.

## FACTS

### I.  BACKGROUND

E.W. is the biological child of J.W. and S.W. and the youngest of six children.  S.W. had two adopted twins and one biological child from a previous marriage.  J.W. had two biological

children from a previous marriage. All of the children resided with J.W. and S.W. prior to being removed from their care in October 2011. The children were removed from the care of J.W. and S.W. after law enforcement intervened due to concerns of abuse and neglect of S.W.'s adopted twins. E.W. was four years old at the time he was removed from his parents' care.

Child Protective Services (CPS) investigative social workers inspected the family home on October 7, 2011. During the investigation, both parents referred to the adopted twins as "monsters." Clerk's Papers (CP) at 318. The adopted twins were thin and pale, and appeared malnourished. The refrigerator and pantry were locked and a surveillance system had been installed inside the home. The bedroom of the adopted twins was filthy, unsanitary, and lacking electricity. The door handle inside the bedroom had been removed and a sliding lock had been installed on the hallway side of the door. The social workers observed a hole in the wall between two of the bedrooms, which the younger children used to pass food to the twins. The social workers were told that the twins were disciplined with a 2"x 4" board. The board was later located and noted to have blood on it.

When CPS social workers first investigated the house, E.W. appeared healthy and chubby. The social workers expressed concern that E.W. was a victim of emotional abuse as a result of witnessing the physical abuse in the home, and they worried that E.W.'s young age would make him a vulnerable target once the other children were removed from the home.

The State, through the Department of Social and Health Services (Department) filed a petition on October 12, 2011, and E.W. was found dependent on October 4, 2012. Disposition orders as to both parents were entered on October 31, 2012.[1]

In February 2013, S.W. was convicted of four counts of second degree assault—domestic violence and one count of unlawful imprisonment—domestic violence, all arising out of S.W.'s acts involving the twins. Similarly, in February 2013, J.W. was convicted of five counts of second degree assault—domestic violence, one count of third degree assault of a child—domestic violence, and one count of unlawful imprisonment—domestic violence.[2] Both parents were sentenced to approximately 20 years of incarceration. At the time of the termination trial, both parents' convictions had been affirmed by this court and remanded for resentencing. S.W. and J.W. indicated an intent to file petitions for review to our Supreme Court, seeking review of their criminal convictions.

After entering foster care, E.W. was referred to individual counseling with Tracey LeBlanc. LeBlanc served as E.W.'s therapist from December 2011 to March 2013. According to LeBlanc, E.W. exhibited ambivalence about wanting to see his parents and cognitive disassociation when stressed. E.W. engaged in repetitive trauma play that centered on food,

---

[1] In separate actions, S.W. relinquished her rights to the adopted twins and her biological son, and J.W. relinquished his rights to his two biological sons.

[2] The juvenile court noted:
> This court is not relying on those convictions as a basis for termination of parental rights. It is a factor to be considered when determining the parents' present views and attitudes when assessing the likelihood that conditions will be remedied in the near future so that the parents could safely visit and parent this child while incarcerated.

CP at 323.

saving smaller animals from bigger animals, and punishment. LeBlanc diagnosed E.W. with posttraumatic stress disorder (PTSD). During his sessions with LeBlanc, E.W. expressed fear of his father, reported that he heard the twins being hit with a board, and stated the twins were not fed enough food or were fed moldy food. E.W. exhibited outbursts, defiance, physical aggression, bullying toward young children and pets, and destruction of other's property. LeBlanc further stated that E.W. had slowly improved as his feelings of safety and sense of belonging increased, at the time of the termination trial, some of E.W.'s extreme behaviors had subsided; he was seeking comfort from others and allowing others to comfort him.

E.W. was originally placed in a foster home, and in March 2013, E.W. was placed in the care of his maternal aunt and uncle in Illinois. However, E.W. returned to Washington foster care in November 2013 due to E.W.'s disruptive behaviors and the lack of services in Illinois. E.W.'s paternal grandparents sought to be a placement, but withdrew their request after assessing how J.W. and S.W. interacted with others involved in the case. E.W.'s maternal grandparents also requested to be a placement, but their requests were denied. The social workers stated that in order to continue his improvement, E.W. needed stability and permanence, and needed to settle into a home, be able to experience emotions, and have the opportunity to have positive sibling relationships.

## II. SERVICES

Both J.W. and S.W. were ordered to complete psychological evaluations, mental health evaluations, domestic violence evaluations, and anger management assessments. Initially, the parents declined to engage in the psychological evaluations upon advice of counsel due to their pending criminal charges and trial. Over the course of the dependency, the Department offered

4

the following services: referral for mental health assessment and recommended treatment, referral for psychological evaluation and recommended treatment, and a referral for anger management evaluation and treatment.

Social worker Shelley Arneson attempted many meetings with J.W. and S.W. after E.W. was removed from the home. She described these meetings as unproductive, largely because J.W. and S.W. were focused on a conspiracy theory involving both J.W.'s and S.W.'s ex-spouses and the four older children. Arneson identified three parental deficiencies in both J.W. and S.W. First, they had poor parenting skills which included inappropriate discipline and a poor understanding of a teenager's nutritional, emotional, and therapeutic needs. Second, they engaged in domestic violence that included poorly managed anger management with episodes of rage directed at the children, and setting up dysfunctional power dynamics between the siblings that involved having some children spy on and report wrongdoing of others to the parents so that physical punishment and emotional degradation would occur in front of siblings. And third, they had untreated mental health issues where they both exhibited a lack of empathy for their children, limited insight into their own behavior, and limited understanding of the needs of others.

According to Arneson, neither parent could safely parent a child. Arneson did not refer J.W. and S.W. to traditional parent education programs because she felt that the parents had not demonstrated sufficient insight into any issues that lead to the removal of their children and, therefore, would likely not benefit from the course work.

In February 2012, the Department referred the parents to Sound Family Solutions LLC for family therapy sessions, but the referral was denied due to Medicaid funding rules and

5

because the treatment provider determined that the parents needed to be closer to reunification with E.W. Also in February 2012, Arneson made a referral to Children's Home Society of Washington for individual counseling. Due to the parent's incomes and assets, Children's Home Society required payment based on a sliding scale, but the parents informed the Department that they could not afford to participate.

In April 2012, Arneson made a referral to Northwest Family Psychology where providers could work individually with the parents. J.W. and S.W. went to all six sessions. J.W. and S.W. demonstrated an understanding of how to interact with E.W. if visitation was approved, but failed to identify any issues in the family home that led to their children's removal.

Arneson testified that E.W.'s visitation with his parents would be a barrier to establishing healthy relationships between E.W. and his siblings and could be a barrier to E.W.'s own healthy emotional development. The juvenile court ordered that one visit with S.W. could occur prior to S.W.'s criminal trial. On August 16, 2012, S.W. and E.W. met in a therapeutic setting for approximately one half hour. E.W. greeted S.W. by first name when he saw her and was happy to see her. S.W. engaged in appropriate play with E.W., refrained from discussing the case with him, and ended the visit on a positive note.

After the visit, E.W. exhibited increased anxiety, behavioral changes, and increased repetitive trauma play. E.W. expressed how seeing his mom broke his heart and that he loves his parents but is also afraid of both his parents. According to Arneson, the Department did not support visitation with the parents due to E.W.'s PTSD and anxiety. Both LeBlanc and Arneson expressed concern that neither J.W. nor S.W. could validate what E.W. claims to have witnessed in the home and thus would be unable to validate his feelings.

The juvenile court allowed J.W. and S.W. to send cards and letters to E.W. once a month. The letters were sent to the social worker, who then forwarded the correspondence to E.W.'s therapist, who determined if the content was appropriate and if E.W. was emotionally stable enough to receive the information. S.W. sent many letters. E.W. wrote to S.W. once in July 2014. J.W. also sent a few letters to E.W., but none of his letters were read to E.W. because E.W.'s therapist did not believe E.W. was emotionally stable enough to hear from his father.

A.      *S.W.*

S.W. completed a psychological evaluation with Dr. Zenger in December 2012. S.W. monopolized the conversation with Dr. Zenger, focusing on her accomplishments and how she was a victim of family members and her ex-husband. S.W. conveyed conspiracy theories about how hers and J.W.'s ex-spouses and the older children were lying to hurt her. S.W. claimed she had no personal problems, and she showed a grandiose sense of self and a sense of entitlement. S.W. failed to identify any parenting or personal weaknesses. S.W. spoke positively of E.W. but described the other five children very negatively.

Dr. Zenger opined that S.W. was a significant risk to parent a child. According to Dr. Zenger, such a consistent and focused negative attitude about a child is a risk factor for maltreatment of children, and that for a child to feel safe and nurtured, a parent should avoid such intense negative criticism. According to Dr. Zenger, S.W. lacks insight and empathy, which are needed to function as a parent. And a parent who lacks empathy, does not take responsibility, and needs excessive admiration, is often resistant to change and would require intense long-term counseling. Such counseling would only be effective if the parent could

7

identify personal problem areas and take some responsibility for the maltreatment or negligent treatment that she has subjected her child to.

B.    *J.W.*

J.W. completed a psychological evaluation with Dr. Poppleton in January 2013. J.W. also discussed conspiracy theories involving his and S.W.'s ex-spouses and the four older children. He denied all allegations about the condition of the home and his treatment of the children. He viewed his older biological children as having wronged him and attributed all the problems in his home to the twins. J.W. was intent on trying to get the opportunity to tell E.W. his version of the truth, and was unable to identify any issues that brought his family into the court system or find ways to remediate any parenting deficiencies so that he could safely parent E.W. and meet E.W.'s developmental needs.

Dr. Poppleton opined that J.W. cannot safely parent a child. According to Dr. Poppleton, J.W. needs acceptance, does not like to be confronted, and does not respond appropriately to anger. J.W. has a history of using corporal punishment, and he lacks impulse control, blames others, and lacks empathy. It was Dr. Poppleton's opinion that without a change in the orientation of his viewpoints and inability to take responsibility for why the children were removed from the home, J.W.'s future ability to safely parent was minimal.

III.  TERMINATION TRIAL

An amended petition for termination as to both parents was filed on December 3, 2014. After this court affirmed their convictions and remanded the case for resentencing, J.W. and S.W. moved the juvenile court for a continuance on the basis that their criminal cases were ongoing because their resentencing hearings had not been completed and they intended to file

petitions for review in our Supreme Court. J.W. and S.W. requested, in the alternative, that the juvenile court enter a protective order barring the State from using any testimony by J.W. or S.W. in any future criminal proceedings. The juvenile court applied the *Olympic Pipeline Company*[3] factors and denied the motions, explaining:

> Given the fact that they both testified in the criminal proceeding, the fact that they have been convicted, the fact that there's a strong statutory interest in proceeding forward with the trial and establishing some degree of finality on the decision regarding [E.W.], the fact that the cases are not identical, there's some overlap factually, but the nature of the cases is fundamentally different, even though there, again, may be some factual overlap, the Court's inclination will be to deny the motion for the continuance.
> At this time, I'm going to deny the motion for the protective order, but I will take that up on a break time to look at it again. So I'm going to deny it at this time without prejudice, but I'll look at it in some more detail when we take a break.

Verbatim Report of Proceedings (VRP) (March 9, 2015 AM) at 12-13.

The next day, J.W. and S.W. renewed their motion to continue, reiterating their concern that they'd be forced to make a choice either to not testify at the termination trial and preserve their Fifth Amendment rights, or to testify and have the State use their testimony against them in their criminal case if they won their appeals and received a new trial. Again, the juvenile court denied their motion, concluding that J.W.'s and S.W.'s rights were not being violated and noting that proceeding with the termination trial was in E.W.'s interest.

The Department's witnesses testified as described above. The juvenile court found Arneson, LeBlanc, Dr. Zenger and Dr. Poppleton to be credible and persuasive. The Department did not call either J.W. or S.W. as witnesses in its case in chief. Rather, both J.W. and S.W. elected to testify on their own behalf. S.W. asserted her Fifth Amendment right nine times

---

[3] *King v. Olympic Pipeline Company*, 104 Wn. App. 338, 348, 16 P.3d 45 (2000).

during her testimony. J.W. asserted his Fifth Amendment right six times during his testimony. Both parents asked the court not to terminate their parental rights.

S.W. described the 10 classes and programs she had been able to engage in while incarcerated and indicated an intent to begin more programs. She testified: "I'm normal. I have no mental health issues," and identified her deficiencies as having low self-esteem, feelings of abandonment, correcting any negative talk within her brain, and coping with being yelled at as a child. S.W. appeared unable to identify ways in which she could have approached her care for her children differently and did not identify any risks that J.W. posed. Her only acknowledgement as to anger was that she would no longer implode and could now better handle the verbal abuse by her brother, and verbal, physical, and sexual abuse by her ex-husband. S.W. identified herself as a victim and failed to see that any of her children had been victims in her home.

J.W. described the services he engaged in while in prison. He attended seven individual counseling classes for anxiety and stress related to treatment that he received while in prison, and he attended six other programs. J.W. focused on his grief and loss, and blamed his and S.W.'s ex-spouses for the chaos in his home. J.W. could not identify any past choices with respect to his children that he would make differently other than wishing he had a better psychological background to deal with high needs children. When asked how he would respond to E.W. when E.W. discussed hearing children cry, hearing children being punished, and helping the twins who he thought were starving, J.W. responded that none of that happened.

On April 2, 2015, the juvenile court entered an order terminating the parental rights of both S.W. and J.W. to E.W. The court made detailed findings of fact. Based on its findings, the

court concluded that the elements of RCW 13.34.180(1)(a) through (f) had been established by clear, cogent, and convincing evidence. The court further concluded that the Department established by clear, cogent, and convincing evidence that the parents could not maintain a meaningful role in E.W.'s life, it was in the best interests of E.W. to terminate the parents' rights, and no other options such as guardianship were available as provided in RCW 13.34.180(5). The court also concluded that the Department established by clear, cogent, and convincing evidence that the Department made reasonable efforts and barriers exist to prevent reunification as provided in RCW 13.34.145(5)(b). The court also concluded that the Department established that the mother and father were unfit and unable to parent, and that termination of the mother and father's parental rights were in E.W.'s best interest.

J.W. and S.W. appeal.

## ANALYSIS

The juvenile court may order termination of a parent's rights as to his or her child if the Department establishes the six elements in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. Clear, cogent and convincing evidence exists when the ultimate fact in issue is shown to be highly probable. *In re the Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). The Department must also prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b).

Because the juvenile court has the advantage of observing the witnesses, deference to the court is particularly important in termination proceedings. *In re the Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); *In re Dependency of K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). "Where the trial court has weighed the evidence, review is limited to

11

ascertaining whether the findings of fact are supported by substantial evidence, and if so, whether the findings support the conclusions of law and the judgment." *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *In re Welfare of T.B.*, 150 Wn. App. 599, 607, 209 P.3d 497 (2009). Where, as here, the proof required is clear and convincing, "the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test." *P.D.*, 58 Wn. App. at 25. Moreover, we defer to the juvenile court's credibility determinations when reviewing an order terminating parental rights. *T.B.*, 150 Wn. App. at 607.

## I. FIFTH AMENDMENT

J.W. and S.W. argue that their Fifth Amendment rights were violated when the juvenile court terminated their parental rights "based in large part on the parents' failure to admit abusing their children."[4] Br. of Appellant (J.W.) at 219. We disagree.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Similarly, the Washington Constitution provides, "No person shall be compelled in any criminal case to give evidence against himself." Wash. Const. art. I, § 9. The availability of the Fifth Amendment privilege does not turn on the type of proceeding in which its protection is invoked, but upon the nature of

---

[4] J.W. and S.W.'s argument requires us to either determine or assume that the trial court's decision was in fact "based in large part on the parents' failure to admit abusing their children." Br. of Appellant (J.W.) at 21. We do not evaluate the weight the trial court gave to its respective findings. Rather, we defer to the trial court's evaluation of the persuasiveness of the evidence. *In re Marriage of Rich*, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

the statement or admission and the exposure it invites. *State v. King*, 130 Wn.2d 517, 524, 925 P.2d 606 (1996).

The privilege against self-incrimination may be raised in any proceeding, "civil or criminal, formal or informal, where the answers might incriminate [the questioned person] in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973). One whose conviction is on appeal has a continuing right to claim a Fifth Amendment privilege. *State v. Dictado*, 102 Wn.2d 277, 287, 687 P.2d 172 (1984). Generally, if a person desires not to incriminate himself or herself, he or she must invoke the protection of the Fifth Amendment privilege against self-incrimination rather than answer. *State v. Post*, 118 Wn.2d 596, 605, 826 P.2d 172, 837 P.2d 599 (1992).

At trial, J.W. and S.W. invoked the Fifth Amendment a handful of times during cross-examination. However, nothing in the record supports J.W.'s and S.W.'s claims that the juvenile court based its termination decision on J.W.'s and S.W.'s invocation of their Fifth Amendment right. J.W. and S.W. rely on *In re Welfare of J.G.W.*, 433 N.W.2d 885 (Minn. 1989) and *In re Dependency of J.R.U.-S.*, 126 Wn. App. 786, 110 P.3d 773 (2005), to support their position, however those cases are factually distinguishable. Here the juvenile court neither "require[d] the parent[s] to admit guilt as a part of a court-ordered treatment plan" as described in *J.G.W.*, 433 N.W.2d at 886, nor made "an express threat to file a termination petition if the parent[s] invoked the [Fifth Amendment] privilege," as described in *J.R.U.-S.*, 126 Wn. App. at 795. Rather, the juvenile court's findings of fact regarding J.W.'s and S.W.'s testimony are substantially supported by J.W.'s and S.W.'s affirmative answers on the record.

Volunteered statements are not barred by the Fifth Amendment. *State v. King*, 78 Wn. App. 391, 399, 897 P.2d 380 (1995). J.W. and S.W. testified at trial and participated in evaluations with experts; they voluntarily made statements about themselves, their parenting abilities, and their home. At no point were J.W. or S.W. compelled to respond in any particular manner, or to respond at all. The record clearly shows that J.W. and S.W. were aware of their Fifth Amendment right to not answer questions; the court's reliance on J.W.'s and S.W.'s affirmative, voluntary statements was proper.

Following cross-examination, the juvenile court asked S.W. a series of questions and specifically asked why she believed the Department was bringing the termination proceeding. S.W.'s response was that the social workers had been hostile towards her from day one and no one ever asked for her side of the story. When J.W. was asked if he thought E.W. was impacted by anything he saw or heard in the home, J.W. responded, "Well, according to the multiple reports I've been hearing, he seems to think so." VRP (March 12, 2015 PM) at 894. The Department followed up, "Do you believe that?" J.W. responded, "No." VRP (March 12, 2015 PM) at 894. When asked about Dr. Poppleton's testimony that J.W. lacked empathy and insight, J.W. responded, "I don't know where he's getting that from." VRP (March 12, 2015 PM) at 892. The Department asked J.W. about E.W.'s descriptions of his home life:

> [Department]: So you didn't understand that there were concerns about [E.W.]'s fear of you?
> [J.W.]: That is correct.
> [Department]: Would you—if—now that you've heard all of this over the last few days, now do you understand some of [E.W.]'s fear of you?
> [J.W.]: I understand his—that—his fear of me, yes.
> [Department]: And what do you understand that fear to be based on?
> [J.W.]: His beliefs somehow.
> [Department]: But you don't believe that he's correct in his beliefs; is that right?

14

[J.W.]:                It was my life and he was my son, and I know what went on in the house.  I don't understand how he could have witnessed these things.
[Department]:   Because you're saying that none of those things happened?
[J.W.]:                Correct.

VRP (March 12, 2015 PM) at 895.  J.W.'s and S.W.'s affirmative testimonies support the juvenile court's findings.

Furthermore, "[i]t is well settled that in civil litigation the exercise by a party of his or her Fifth Amendment privilege does not protect the invoking party from adverse inferences that may logically be drawn from its exercise."  *Diaz v. Washington State Migrant Council*, 165 Wn. App. 59, 85, 265 P.3d 956 (2011).  Any inferences drawn from J.W.'s and S.W.'s exercise of their right to remain silent were consistent with the rest of the evidence presented by the various experts and witnesses proving J.W.'s and S.W.'s inability to identify any parental deficiencies.

Neither their arguments, nor the record, support J.W.'s and S.W.'s contention that their parental rights were terminated because they invoked their Fifth Amendment right against self-incrimination.  Rather, the juvenile court terminated J.W.'s and S.W.'s parental rights because they were unable to acknowledge any parental deficiencies; a conclusion supported by their voluntary statements.  Accordingly, J.W and S.W's claim that the juvenile court violated their Fifth Amendment rights fails.

## II.  PROTECTIVE ORDERS

J.W. and S.W. argue that the juvenile court erred by denying their motions for protective orders barring the State from using their testimony in any future criminal case.[5]  We disagree.

_____

[5] Because the protective order was not the focus of J.W.'s and S.W.'s motions below, the record on this issue is relatively underdeveloped.  The juvenile court denied the motion without

We review a court's determination on a motion to grant a protective order for abuse of discretion.  *Olympic Pipeline Co.*, 104 Wn. App. at 348.  A trial court abuses its discretion only if no reasonable person would have taken the view adopted by the trial court.  *Olver v. Fowler*, 161 Wn.2d 655, 664, 168 P.3d 348 (2007).

J.W. and S.W. did not offer the juvenile court any authority or argument in support of their motion for protective orders, focusing instead on their motion to continue.  Their request for protective orders were made as an alternative to their motion to continue based on their concerns that their Fifth Amendment rights would be implicated should they testify without immunity.  We have held that because the Fifth Amendment allows a person not to answer official questions put to him in a civil proceeding where the answer might incriminate him in future criminal proceedings, protective orders may be appropriate in some civil dependency cases.  *In re Dependency of Q.L.M. v. State*, 105 Wn. App. 532, 544, 20 P.3d 465 (2001).  However, because the grant of immunity is normally a prosecutorial function, only in certain limited circumstances does a court have inherent authority to grant a protective order of immunity.  105 Wn. App. at 544.

Given the lack of authority or argument offered by J.W. and S.W. at trial, a reasonable person could have agreed with the juvenile court in denying J.W.'s and S.W.'s motion for a protective order.  Therefore, we hold that the juvenile court did not abuse its discretion.

prejudice, noting that he would look at it in more detail during a break.  The issue was never brought up again.

III. RCW 13.34.180(1)(f) AND 13.34.145(5)(b)

J.W. and S.W. also argue that the juvenile court erred by concluding that the Department met its burden under RCW 13.34.180(1)(f) in light of the factors enumerated at RCW 13.34.145(5)(b).[6] Particularly, J.W. and S.W. argue that the Department failed to make reasonable efforts to keep the family together by failing to (1) provide visitation particular to the needs of J.W. and S.W., (2) coordinate services for J.W. and S.W. while they were incarcerated, and (3) adequately investigate an alternative placement for E.W. where S.W. and J.W. could maintain a bond with him. We disagree.

RCW 13.34.180(1)(f) requires that before a juvenile court terminates an incarcerated person's parental rights under RCW 13.34.180(1), the Department must prove by clear, cogent and convincing evidence, and the court shall consider (1) whether the parent maintains "a meaningful role in the child's life based on factors identified in RCW 13.34.145(5)(b)," (2) whether the Department made "reasonable efforts" as defined in the statute, and (3) whether "particular barriers" described in RCW 13.34.145(5)(b) impeded the parent from "accessing visitation or other meaningful contact with the child." RCW 13.34.180(1)(f).

The juvenile court's resolution of the RCW 13.34.180(1)(f) factors must be informed by evidence presented and conclusions reached regarding the six factors contained in RCW 13.34.145(5)(b). *In re Dependency of A.M.M.*, 182 Wn. App. 776, 787, 332 P.3d 500 (2014). These factors include:

> (i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

---

[6] On October 22, 2015, J.W. motioned this court to adopt S.W.'s argument on this issue. This court granted his motion on October 27, 2015.

(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

(iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;

(iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;

(v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

RCW 13.34.145(5)(b). These incarceration factors are meant to require juvenile courts to consider whether an incarcerated parent could maintain a meaningful role in the child's life and to require the Department to make reasonable efforts to help the incarcerated person remedy parental deficiencies. *In re Termination of M.J.*, 187 Wn. App. 399, 408, 348 P.3d 1265 (2015).

"A consideration of evidence ultimately means a weighing or balancing of facts, along with a resolution of that weighing. In many instances, particularly where the evidence is uncontested or the [Department]'s case is very strong, the court's conclusion will need no further explication." 187 Wn. App. at 409 (internal quotation marks omitted).

A.      *Visitation*

RCW 13.34.180 does not require the Department provide visitation. 187 Wn. App. at 412. Rather, the Department has an obligation to *consider* what it can do to preserve the family unit. To that end, visitation may be necessary unless it is not in the best interest of the child. 187 Wn. App. at 412. Thus, while visitation will frequently be part of the services the Department

18

must provide an incarcerated parent, it is not an absolute obligation in all cases. 187 Wn. App. at 412.

Here, the Department offered abundant evidence as to why visitation was limited because it was not in the best interest of E.W. The Department, the CASA guardian ad litem, and E.W.'s therapists all opposed any form of visitation during the dependency. Arneson testified that the Department did not support visitation with the parents based on the therapist's recommendations due to E.W.'s PTSD and anxiety, continued disclosures in therapy about witnessing or hearing abuse and neglect of the older siblings in his parents' home, disassociation after disclosing events or being in chaotic situations, fear of his father and his father's temper, and difficulty of reconciling the kindness he received from his mother versus how the other children were treated in the family home. The juvenile court noted that following the lone visit between E.W. and S.W. during the dependency, E.W. had an increase in anxiety, more behavioral challenges, and an increase in repetitive trauma play.

"Where it is not in the best interests of the child, visitation should not be forced upon the child." 187 Wn. App. at 413. Given the particular needs of E.W., the juvenile court did not err in its evaluation of the Department's efforts to arrange visitation between E.W. and his parents.

B. *Services*

The juvenile court made an express written finding that services "have been expressly and understandably offered or provided and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." J.W. and S.W. offer no argument or evidence showing this

finding was not supported by substantial evidence. Rather, the record shows that social worker Arneson facilitated numerous referrals to programs and services for the parents.

Furthermore, the Department need not offer services when a parent is unable to benefit from the services. *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Even when the Department "inexcusably fails" to offer services to a willing parent, termination will still be deemed appropriate if the services would not remedy the parent's deficiencies in the foreseeable future, which depends on the age of the child. *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001). When the record establishes that the offer of services would be futile, the juvenile court can find that the Department offered all reasonable services. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008).

Here, the juvenile court found that S.W. and J.W. had "not responded positively to any issues identified by the Department or by treatment providers; and, thus, have not been able to make any progress in services that would assist them in acknowledging and correcting their deficiencies." CP at 329. The court acknowledged that the types of services available in prison are not necessarily geared towards the intense services needed by S.W. and J.W., but found that there were some services which could have some therapeutic effect if S.W. and J.W. demonstrated any indication of insight and took some responsibility for the trauma inflicted on their children. The juvenile court did not err by concluding that the Department lived up to its statutory duty to provide reasonable services.

C.    *Alternative Placement*

The uncontested findings show that the Department made reasonable efforts to consider a permanent placement that would allow J.W. and S.W. to maintain a relationship with E.W. The

juvenile court expressly found the "Department considered other family members as permanent placement option [sic]; so that the child could maintain some attachment to family of origin." CP at 328. S.W. and J.W. neither challenge this finding nor offer any argument or evidence supporting their contention. For these reasons, we hold that the juvenile court properly concluded that the Department met its burden under RCW 13.34.180(1)(f) in light of the factors enumerated at RCW 13.34.145(5)(b).

## CONCLUSION

In conclusion, we hold that the juvenile court did not enter its order terminating J.W.'s and S.W.'s parental rights to E.W. in violation of their Fifth Amendment rights, the juvenile court did not abuse its discretion by denying J.W.'s and S.W.'s motion for protective orders, and the juvenile court did not err in concluding that the Department met its burden under RCW 13.34.180(1)(f). For these reasons, we affirm the juvenile court's termination of J.W.'s and S.W.'s parental rights to E.W.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Bjorgen, C.J.

Lee, J.

21